UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
In re: EPHEDRA PRODUCTS LIABILITY       :     04 M.D. 1598 (JSR)
LITIGATION                              :
                                        :     OPINION AND ORDER
----------------------------------------X
PERTAINS TO *Stafford v. Weight Watchers
Inc.* et al, No. 05 Civ. 3021

JED S. RAKOFF, U.S.D.J.

    Defendants' motion for summary judgment dismissing the
complaint for failure to show causation is denied; their motion
to exclude the opinions of Wesley Dennis, M.D. is granted in part
and denied in part;  and their motion for summary judgment
dismissing the complaint as to individual defendant Michnal for
lack of personal jurisdiction is denied.

    The relevant facts, undisputed or, where disputed, taken
most favorably to plaintiff, are as follows:

    Plaintiff Sharon Stafford, a Texas resident, became
disoriented at work on December 11, 2002, at age 54.  Her
supervisor told a co-worker, Sue Schlosser, to take plaintiff to
the emergency room and to bring the doctors a bottle of
ThermoSlim, defendants' ephedra product, which Schlosser and
other co-workers had seen in plaintiff's possession at work.
Deposition of Sue Schlosser dated August 4, 2006 ("Schlosser
Dep.") at 15-18.  In the emergency room, plaintiff's blood
pressure was measured as 240/94.  Plaintiff's Rule 56.1 Statement

1

("Pl. 56.1"), Ex. O ("Emergency Department Record").  The
hospital records, as read by Dr. Dennis into the transcript of
his deposition, include the following impressions of the
consulting neurologist: "an unusual stroke or encephalopathy due
to elevated blood pressure"; "There's a question of diet
treatment induced hypertension, vasospasm."  Deposition of Wesley
D. Dennis, M.D dated January 9, 2006 ("Dennis Dep.") at 88 and
92.  The hospital performed its standard toxicological tests, all
of which proved negative, Defendants' Rule 56.1 Statement ("Def.
56.1"), Ex. L ("All Saints Records") at 9, but the tests did not
screen for ephedrine.  Dennis Dep. at 126.

    In 1994, plaintiff's family physician, Edmond Evans D.O.,
measured her systolic blood pressure in the 160-170 range,
Deposition of Edmond C. Evans dated February 8, 2006 ("Evans
Dep.") at 15, and had prescribed medication to lower it, which
Ms. Stafford apparently was no longer taking at the time of her
2002 stroke.  See Emergency Department Record.  Also in 1994, Dr.
Evans diagnosed plaintiff as diabetic, Evans Dep. at 14, and by
2003 her diabetes had caused "atherosclerotic changes," Dennis
Dep. at 15.  In 2000, Dr. Evans recorded plaintiff's weight at
234 lbs. and admonished her to lose weight, as he had done on
previous occasions.  Evans Dep. at 25.  Plaintiff had suffered a
mild previous stroke in 1997, Dennis Dep. at 9-10, without
lasting symptoms or significant absence from work.  Id.  After

her stroke in 2002, however, Dennis determined Stafford was unable to return to work. Dennis Dep. 105-06.

Plaintiff complains of impaired memory, Deposition of Sharon Stafford ("Stafford Dep.") at 21-22, and does not recall details of her purchase and use of ThermoSlim.  Id. at 25.  A canceled check, however, shows that she paid defendant Universal Nutrition Corp. ("UNC") $127.95 for an order of ThermoSlim on 11/6/02.  Pl. 56.1 Ex. R.  There is no evidence of the dose she was taking at the time of her stroke.  Plaintiff did testify that she had heard about ThermoSlim "through a TV ad," Stafford Dep. at 15-16, but remembers nothing about the ad except that it said ThermoSlim "would help you lose weight."  Id. at 56.  The hospital records note that plaintiff had lost 25 lbs. in the month preceding her stroke. Dennis Dep. at 86, 152.

At all relevant times, defendant UNC, a Nevada corporation having its principal office in Florida, was marketing and selling ThermoSlim in Texas and elsewhere.  Def. 56.1 ¶¶ 5, 70.  UNC paid for an "infomercial" promoting ThermoSlim to be televised in the Dallas/Forth Worth market,  Declaration of Robert J. Michnal dated September 20, 2006 ("Michnal Decl.") ¶ 23.  Plaintiff alleges and defendant has not disputed that this infomercial was televised in plaintiff's viewing area at times consistent with plaintiff's order of ThermoSlim from UNC.  Plaintiff's Response and Brief to Defendants' Motion for Summary Judgment at 3.  UNC

3

had no employees; defendant Robert Michnal, a resident of
Florida, was its sole shareholder, sole director, president, and
treasurer; his wife, Roma Michnal, was its secretary.  Michnal
Decl. ¶¶ 2, 9.

Defendant MTM Marketing and Consulting Inc. ("MTM") was a
Georgia corporation having its principal office in Norcross,
Georgia.  Def. 56.1 ¶ 86.  In performance of a contract with UNC,
MTM warehoused a stock of ThermoSlim and packaged and shipped
ThermoSlim to customers who had ordered it from UNC by mail or
over the Internet.  Michnal Decl. ¶ 16.  Michnal was MTM's sole
shareholder, sole director, president, and treasurer; his wife
was MTM's secretary.  Id. ¶ 5.  MTM employed a bookkeeper,
purchasing manager, receptionist, warehouse manager, and
temporary employees.  Id. ¶ 4.

The witness whose opinions are sought to be excluded, Wesley
Dennis, M.D., was plaintiff's treating neurologist from April
2003 until March 2005, when the group practice where he was
working dropped plaintiff as a patient because of a problem with
her insurance.  Dennis Dep. at 12, 37-40.  Defendants noticed his
deposition as a fact witness in January 2006 and paid him
$300/hour for his time in so testifying.  Id. at 130.  He has
received no other payment from plaintiff.  See transcript of oral
argument 3/1/07 at 37-38.  Dennis was deposed as a fact witness
and was never contacted by plaintiff's counsel about serving as

4

an expert in the case.  Dennis Dep. at 6, 129-30.  During his deposition, however, counsel for one of the defendants showed him medical articles and elicited his opinions, as if examining an expert witness.  See id. at 66-67.  In response, plaintiff's counsel showed Dr. Dennis additional documents (including plaintiff's hospital records, which he had not seen before) and elicited Dr. Dennis's opinions, including one on general causation:

> Q: And what's your understanding of what ThermoSlim is?
> A: ThermoSlim contains an ephedrine based product.
> Q: Is that important to you as a physician?
> A: Yeah.
> Q: Why is that?
> A: Well, ephedrine or ephedrine products can increase one's blood pressure, and it can certainly do that in someone who has an underlying history of high blood pressure so then it can ultimately lead to stroke and even hemorrhagic stroke in susceptible people.

Id. at 100.  On this basis, plaintiff's counsel then elicited the following opinion of Dr. Dennis on case-specific causation:

> I think ephedra was a contributing factor ... which led to her stroke.

Id. at 127.

When defendants resumed their examination, they explored at length Dr. Dennis's bases for the foregoing opinions.  Dr. Dennis answered that he had read about ephedra in recent articles in neurology publications, id. at 137, 147; see also id. at 30-31,

and that he had treated about ten patients who were using
ThermoSlim and told them all to stop using it because he thought
it might be contributing to their neurologic symptoms, id. at
154-55.  Defendants' counsel then elicited the testimony that Dr.
Dennis could not rule out other possible causes because
plaintiff's risk factors (prior stroke, diabetes with consequent
atherosclerotic changes, history of high blood pressure, obesity)
"in and of themselves which could have led to a stroke," id. at
146, 165, and that, because the relationship between high blood
pressure and stroke goes both ways -- high blood pressure can
cause stroke but also a stroke can raise blood pressure -- "It's
difficult to sort out what happened first."  Id. at 144.  In her
pre-trial disclosures, plaintiff listed Dr. Dennis a
"non-retained medical expert" who "will testify that ThermoSlim
caused and/or contributed to Ms. Stafford's medical condition."
Pl. 56.1, Ex. Q. at 2.

    Turning first to defendants' summary judgment motions to
dismiss as to all defendants, defendants contend that, on the
record before the Court, plaintiff has failed to establish
causation.  Under Texas law, which both sides agree governs this
issue here, a plaintiff in a toxic-tort case must establish both
general and specific causation.  Allison v. Fire Ins. Exchange,
98 S.W.3d 227, 239 (Tex. App. 2002).  Defendants argue that they
are entitled to summary judgment because the plaintiff here

cannot establish either general or specific causation under the applicable standards.

As to general causation, plaintiff, consistent with the rulings made earlier by this Court, will, if this case goes to trial, seek to satisfy her burden as to general causation by calling one or more of the "generic experts" previously approved by the Court to testify that "ephedra may likely be a contributing cause of stroke in some people," Case Management Order No. 20 ¶ 7(a), and to present the underlying medical data, principles and methods that were disclosed in the corresponding expert reports approved by this Court. Defendants argue that such proof is insufficient because in Texas general causation in toxic tort cases must be proven, they claim, by statistically significant epidemiological studies showing that exposure to the accused substance at least doubled the risk of the alleged injury -- a kind of proof that concededly is not available here. Defendants, however, rely for this view of Texas law on Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997), which is inapplicable here.

Specifically, Havner involved the allegation that the drug Bendectin caused birth defects. Because there was no obvious reason for why this should be so, the Texas court concluded that nothing short of solid epidemiological proof would suffice to establish causation. By contrast, the view that ephedra is

likely to be a contributing cause of stroke in some people follows quite plausibly from the established linkages between ephedra and high blood pressure and between high blood pressure and stroke.  Such plausibility of causation materially distinguishes this case from the facially inexplicable correlation between Bendectin use and birth defects addressed in Havner and thus renders irrelevant here the extremely high proof of causation required in that case.

As for specific causation, Texas permits juries, in appropriate circumstances, to infer specific causation of bodily injury without medical expert testimony.  See, e.g., Byrd v. Delasancha, 195 S.W.3d 834 (Tex. App. 2006).  Here, a jury could reasonably infer that plaintiff was consuming a significant dose of ThermoSlim immediately before her stroke from the fact that -- after years of persistent obesity -- she lost 25 lbs. during the short time between her ordering ThermoSlim from UNC and her stroke.  Given the generic testimony of causality that would be presented to the jury, the jury could then reasonably infer that plaintiff's many risk factors put her among the vulnerable subset of ephedra users for whom, according to the generic experts, ephedra may likely cause stroke.

In other words, even if the Court were to exclude Dr. Denis's testimony in its entirety, defendants' summary judgment motion on causation would still be denied.  The point is somewhat

academic, however, for the Court finds admissible under Rule 702, Fed. R. Ev., Dr. Denis's specific causation opinion that "I think ephedra was a contributing factor which led to her stroke." In effect, Dr. Dennis is making the same inference of specific causation that the jury would be permitted to make on this record without his testimony, but he does so in the context of specialized knowledge, training and experience. Unlike the opinion of a non-treating physician or scientist, Dr Denis's opinion is offered against the background of his intimate knowledge of the plaintiff herself, albeit knowledge obtained through treatment given after the stroke had occurred. His opinion "will assist the trier of fact," Rule 702, because a reasonable juror would want to know what inferences a treating physician would make from the circumstantial evidence before the jury.

Dr. Dennis was independently familiar with much of the "good science" about ephedra that is summarized in the generic experts' reports. In the ordinary course of his neurological practice, he had treated about ten patients who were using ThermoSlim and advised them to quit — without scientific proof, but because his knowledge, training and experience led him to believe that ThermoSlim probably was causing them harm. In other words, the challenged opinion was sufficiently reliable to guide good medical practice outside the courtroom.

It should be remembered that so-called "Daubert gatekeeping"
became necessary because of the "corrupting influence" of expert
witnesses who "are available to render an opinion on almost any
theory, regardless of its merit" and are "more than willing to
proffer opinions of dubious value for the proper fee." E.I. du
Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 553
(Tex. 1995) (adopting for Texas state courts the principles set
forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579 (1993)).  In contrast, the circumstances and content of Dr.
Dennis's deposition show just the opposite: that he is a neutral
expert whose opinion was formed without any monetary inducement
and was, indeed, first inquired into by defendants.  For all
these reasons, the challenged opinion has sufficient indicia of
reliability to be admitted under Rule 702.

    As for defendants' argument that Dr. Denis's opinion was not
adequately disclosed, the facts about Dr. Dennis set forth above
show that no report was required by Rule 26(a)(2)(B), Fed. R.
Civ. P., because he was not "retained ... to provide expert
testimony in the case."  Instead, plaintiff's disclosure
obligation was governed by Rule 26(a)(2)(A), whose requirements
were satisfied by plaintiff's original and amended disclosure of
case-specific expert witnesses filed on August 28, 2006 and
October 20, 2006.  Pl. 56.1 Ex. P, Q.

    With respect to all other opinions of Dr. Dennis on

causation, however, defendants' motion to exclude is granted.  In particular, Dr. Dennis may not offer any opinions of his own about the inherent properties of ephedra; instead, he must use as the generic foundation for his above-quoted opinion whatever general-causation testimony has been admitted at trial before he takes the stand.  When testifying at trial about the basis of opinion, he shall limit himself to what he actually disclosed in his deposition or likely would have then disclosed in answer to an appropriate question.

Turning finally to the issue of personal jurisdiction, defendants do not dispute that the exercise of personal jurisdiction over UNC by the Texas court where this case was originally brought was proper under the due process clause of the U.S. Constitution.  They argue, however, that personal jurisdiction over individual defendant Michnal is improper because the corporate veil shields Michnal from the legal consequences of the acts of UNC unless Michnal is the alter ego of UNC, a theory that plaintiff has not pleaded.  See Vosko v. Chase Manhattan Bank, N.A., 909 S.W.2d 95, 100 (Tex. App. 1995).

Defendants' reliance on the corporate veil is misplaced. The corporate veil shields a shareholder from liability in his capacity as shareholder;  but it in no way shields a corporate agent from personal liability for his tortious acts.  A "corporation can only act through its agents," Ebby Halliday Real

11

Estate, Inc. v. Murnan, 916 S.W.2d 585, 590 (Tex. App. 1996), and on this record it appears that Michnal was UNC's *only* agent. Therefore, every act of UNC giving rise to Texas jurisdiction and substantive liability was performed through Michnal.  An "actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment."  Restatement (Third) of Agency § 7.01 (ALI 2006).  See Guilbeau v. Anderson, 841 S.W.2d 517, 519 (Tex. App. 1992) ("It is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation.")  Accordingly, UNC's contacts with Texas and its acts allegedly constituting products liability and fraud are attributable to Michnal individually.

Defendants also argue that Texas' jusisdiction over MTM was improper because MTM's only role was to store, package and ship ThermoSlim in fulfilment of orders received by UNC.  The Court finds in this record a genuine issue to be tried about whether MTM engaged in the tort of distributing an unreasonably dangerous product in Texas.  If plaintiff's allegations about MTM are proven at trial, MTM would have distributed ThermoSlim through continuous and systematic shipments into Texas (acts giving rise to "general jurisdiction") and would have shipped to plaintiff in Texas the bottles of ThermoSlim that caused her injury (an act giving rise to "specific jurisdiction").  Thus, although not

12

compelled to do so, a reasonable jury could find facts showing that exercise of personal jurisdiction over Michnal and MTM does not offend "traditional notions of fair play and substantial justice."   International Shoe v. Washington, 326 U.S. 310, 316 (1945).

For the forgoing reasons, the Court denies defendants' motion for summary judgment dismissing the complaint for failure to show causation, denies defendants' motion for summary judgment dismissing the complaint as to defendants MTM and Michnal and denies in part and grants in part defendants' motion to exclude the opinions of Wesley Dennis, M.D.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       March 26, 2007

13